UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LARRY JOHNSON, JR.,

                                    Plaintiff,                    No. 15-CV-7823 (KMK)

        v.                                                        OPINION & ORDER

OFFICER KITT, *individually*,

                                    Defendant.[1]

<u>Appearances</u>:

Larry Johnson, Jr.
Waterbury, CT
*Pro Se Plaintiff*

Irma W. Cosgriff, Esq.
Taryn A. Chapman, Esq.
Giacomo G. Micciche, Esq.
Westchester County Attorney's Office
White Plains, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Larry Johnson, Jr. ("Plaintiff") brings this pro se Action, pursuant to 42 U.S.C. § 1983,

against Officer Matthew Kitt ("Defendant" or "Kitt"), alleging a violation of his constitutional

rights while he was incarcerated at Westchester County Jail.  (*See* Third Am. Compl. ("TAC")

(Dkt. No. 107).)  Before the Court is Defendant's Motion for Summary Judgment pursuant to

Rule 56 of the Federal Rules of Civil Procedure (the "Motion").  (*See* Not. of Mot. (Dkt. No.

182).)  For the reasons that follow, the Motion is granted.

---

[1] The Court has updated the caption of this case to reflect the sole remaining Defendant.

## I.  Background

### A.  Factual Background

The following facts are taken from Defendant's statement pursuant to Local Civil Rule 56.1, (Def.'s Rule 56.1 Statement in Supp. of Mot. ("Def.'s 56.1") (Dkt. No. 185)), Defendant's accompanying exhibits, (*see* Decl. of Irma Cosgriff, Esq., in Supp. of Mot. ("Cosgriff Decl.") (Dkt. No. 183)), and Plaintiff's Third Amended Complaint, and are recounted "in the light most favorable to" Plaintiff, the non-movant, *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (citation omitted).  Defendant has sent the required Local Rule 56.2 Notice to Plaintiff.  (*See* Not. to Pro Se Litigant (Dkt. No. 188).)[2]

---

[2] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  *Id.* at 56.1(b).  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same).  "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted).  Here, Defendant filed and served his statement pursuant to Rule 56.1, (*see* Def.'s 56.1), in addition to the requisite statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (*see* Not. to Pro Se Litigant).  Despite this notice, Plaintiff failed to submit a response to Defendant's 56.1 Statement of Facts.  Accordingly, the Court may conclude that the facts in Defendant's 56.1 Statement are uncontested and admissible.  *See Brandever,* 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record" when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted); *see Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Benefit Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although

The events in this case took place while Plaintiff was an inmate at Westchester County Jail (the "Jail").  (Def.'s 56.1 ¶¶ 1–3; TAC ¶ 1.)  Plaintiff represents that he is a "devout" Muslim who "makes salaat (individual prayer) five times daily, faithfully attends [Jumu'ah] services every Friday, and observes all Islamic holidays as well as the strict requirements of those holidays, like fasting and attending group prayer ceremonies."  (TAC ¶ 8; Def.'s 56.1 ¶ 3.)[3]  On October 5, 2014, Plaintiff planned to observe Eid-ul-Adha (the "Service"), a "group prayer service" that "is an imperative part of the Ramadan holiday."  (TAC ¶¶ 12–13.)[4]  The Service "can be held at any time from when the sun rises until noon in accord with the Muslim tradition." (Cosgriff Decl. Ex. 10 ("Nashid Aff.") ¶ 4 (Dkt. No. 183-10); *see also* TAC ¶ 13 (stating that the Service must be administered before noon).)

---

[the] plaintiffs did not file a Rule 56.1 statement, the [c]ourt has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1 [statement].");  *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (citation and italics omitted)).

[3] Plaintiff concedes, however, that he was less scrupulous in his religious practice outside of prison.  (*See* Def.'s 56.1 ¶ 3 n.3; Cosgriff Decl. Ex. 2 ("Pl.'s Dep.") 46:6–7 (Dkt. No. 183-2) (acknowledging that he did not practice his religion "as diligently" outside of prison because he was "running wild").)

[4] Quotations to Plaintiff's submissions occasionally reflect minor corrections in grammar, punctuation, and spelling.

1.  Scheduling of the Service

At some point prior to the Service, Plaintiff was informed by Imam John Nashid ("Imam Nashid"), the Jail's Muslim chaplain, that the Service would take place between 11:00 A.M. and 12:00 P.M. on October 5, 2014.  (Def.'s 56.1 ¶ 15; TAC ¶¶ 6, 12.)  Upon learning this, Plaintiff and another inmate, Fahim M. Abdul-Aziz, also known as Tyrone Jackson ("Jackson"), complained to Imam Nashid that 11:00 A.M. was lunch time, and "that no movement is allowed from the beginning of lunch until lunch has concluded and all of the food trays [have been] returned," a process that can "often take[] upwards of [45] minutes."  (TAC ¶ 14; Def.'s 56.1 ¶ 16.)  In response to Plaintiff's concern, Imam Nashid reportedly told Plaintiff "that he would look into it," but never followed up.  (TAC ¶¶ 14, 22; Def.'s 56.1 ¶ 16.)  Plaintiff and Jackson also wrote to Father Paul Tolve ("Father Paul"), (*see* TAC ¶ 15; Def.'s 56.1 ¶ 16), who serves as the Jail's "Director of Pastoral Services," in which capacity he is responsible for "assisting in the scheduling of religious services and ceremonies of all denominations, including Islamic [s]ervices," (Cosgriff Decl. Ex. 9 ("Father Paul Aff.") ¶ 3 (Dkt. No. 183-9)).  Plaintiff conveyed to Father Paul the same concern he had expressed to Imam Nashid, "asking [Father] Paul to reschedule the service to a more appropriate time."  (TAC ¶ 15.)  Plaintiff avers that Father Paul never responded.  (*Id.*)  After writing to Father Paul, Plaintiff "noticed a memo" issued by the Jail's "Warden in Operations," Warden Orlando, notifying inmates that the Service would indeed be held on October 5, 2014 at 11:00 A.M.  (*Id.* ¶¶ 4, 16.)[5]  In response, Plaintiff wrote an inmate

_____

[5] Defendant has produced a memorandum dated September 24, 2014 and prepared by Robert Doty, the Jail's Assistant Warden (the "Doty Memorandum").  (*See* Cosgriff Decl. Ex. 6 ("Doty Mem."), at unnumbered 1 (Dkt. No. 183-6).)  The memorandum stated that "[t]he [Service] will take place on Sunday, October 5th, 2014 and will be conducted by the Muslim inmates in their respective prayer areas."  (*Id.*)  Although Plaintiff claims that the memorandum he saw was "issued by Orlando," (TAC ¶ 16), it is possible he actually saw the Doty

request to Warden Orlando to "inform him of the scheduling conflict." (*Id.* ¶ 16.) In that

request, Plaintiff complained that Defendant, a correction officer at the Jail, "constantly call[ed]

Islamic services very late, and forc[ed] them to . . . end[] early." (*Id.* ¶¶ 7, 16.) Plaintiff also

wrote that "complaints had been made about [Defendant's] repeated interference with Islamic

[s]ervices, and request[ed] that [Defendant] not be put on the post responsible for calling and

concluding the services." (*Id.* ¶ 16.)[6] Plaintiff alleges that his letter was copied and sent to

Warden Orlando's "superior officer," Warden Doty. (*Id.* ¶¶ 3, 16.)[7]

For his part, Defendant has explained that he was not responsible for scheduling the

Service; indeed, he did not even learn about the Service until the morning of October 5. (*See*

Cosgriff Decl. Ex. 3 ("Kitt Aff.") ¶ 6 (Dkt. No. 183-3).) The scheduling of the Service was

instead overseen by Father Paul and Imam Nashid. (Def.'s 56.1 ¶ 27.) They scheduled the

Service for 11:00 A.M. based on several considerations. First, the "Multipurpose Room"

("MPR")—in which all religious services are held—was already in use from 9:30 A.M. to 10:30

A.M. for Protestant services. (*Id.* ¶ 28.) Second, the Service only takes 30 minutes to perform

and, as noted, may take place any time before noon. (Nashid Aff. ¶¶ 4, 9.) A 30-minute "buffer"

---

Memorandum. Plaintiff has not provided a copy of the memorandum supposedly issued by
Warden Orlando.

[6] Plaintiff's tangential allegations that Defendant "constantly call[ed] Islamic services
very late, and forc[ed] them to be ended early," (TAC ¶ 16), do not form the basis of the instant
Action, a fact Plaintiff himself has acknowledged, (*see* Pl.'s Dep. 89:8–13 (stating that
Defendant's alleged behavior with respect to weekly Friday services is "not the issue right now,"
and that the "issue [in his lawsuit] is the [S]ervice")). Thus, the Court will not consider or
address these allegations in resolving the instant Motion.

[7] According to Plaintiff, each of the aforementioned requests were dictated to Jackson,
who typed them on his behalf in the Jail's law library. (Def.'s 56.1 ¶ 20.) Plaintiff has not
produced copies or other documentary proof of these requests. (*See id.* ¶¶ 20–21.)

is required between services in the MPR so that the correction officer "tasked with monitoring said services/activities [may] surveil the MPR for any paraphernalia left by inmates—a significant penological safety concern." (Def.'s 56.1 ¶ 29.)

### 2. Defendant's Calling of the Service

Despite Plaintiff's requests, the Service was not rescheduled, and Defendant was not removed from his call-out responsibility. (TAC ¶ 17.) Plaintiff alleges that on October 5, 2014, Defendant, acting "consistent with his prior actions" of "interfering with Islamic [s]ervices," did not call the Service at 11:00 A.M. as scheduled, but rather called it at 11:45 A.M. (Id. ¶¶ 18, 21.) Further, Plaintiff alleges that "before those intent on attending said [S]ervice could even leave the housing unit, [Defendant] called back and informed the housing unit officer not to release the inmates because the ceremony was already over." (Id. ¶ 18.) Thus, Plaintiff alleges he was prevented from observing the Service. (Id. ¶ 20.) He also asserts there was "[n]o safety [or] security concern" that warranted "delaying or cancelling the [Service]." (Id. ¶ 19.) Although Plaintiff claims there is a logbook entry that corroborates his version of events, he has not been able to produce this evidence, and claims that he has lost the relevant logbook entry. (See Pl.'s Dep. 80:21–24 (Q: "What is the basis for your testimony that [Defendant] called [the Service] at 11:45?" A: "The logbook. You can look in the logbook that it was called at 11:45."); id. at 81:15–16 ("I had a copy of the log in. I don't have it [any] more. I lost it.").)[8]

---

[8] The circumstances surrounding Plaintiff's acquisition of this putative logbook entry are somewhat hazy. At one point in his deposition, Plaintiff testified that an unidentified correction officer "gave [him] a copy of the logbook." (Pl.'s Dep. 81:15–22.) Plaintiff could not remember the name of this correction officer, (id. at 81:22), or what he looked like, (id. at 82:9–11). Plaintiff testified that he and Jackson, his fellow inmate, did not have to ask the correction officer to make them a copy, but that the officer "just did it for [them]." (Id. at 82:2–5.) Later in his deposition, however, Plaintiff testified that he had in fact received a copy of the logbook entry from Jackson, who had received it from a correction officer with whom he was "chummy." (Id.

Defendant has provided a different account of what happened on October 5. That morning, he was administering medications and was not even aware that the Service was scheduled to take place. (*See* Kitt Aff. ¶ 6.) Plaintiff's fellow inmate, Jackson, "who was identified as the 'Muslim Coordinator' and tasked with setting up and preparing for scheduled Muslim services," approached Defendant and notified him "that Muslim services were supposed to be taking place." (*Id.*) Defendant "immediately looked into it" and was provided with the Doty Memorandum, *see supra* note 5. (*Id.*) Shortly thereafter, he received a call from Father Paul, "who confirmed the [Doty] Memo[randum]." (*Id.*) At 10:55 A.M., Defendant "called into the 3-SW pod to have" Jackson, the "Muslim Coordinator," "set up and prepare for the Service prior to calling the Service for participating inmates." (*Id.* ¶ 7.)[9] Defendant "was advised, however, that inmate Jackson was refusing to attend," and was "claiming that the Service was scheduled for the wrong time." (*Id.*) This incident is corroborated by a contemporaneous logbook entry that appears to have been recorded by a correction officer other than Defendant. (*See* Cosgriff Decl. Ex. 5 ("Logbook Entries"), at 0089 (Dkt. No. 183-5).)[10] According to this

---

at 98:3–4, 12–13.) Plaintiff said he did not know which correction officer had initially provided it to Jackson. (*See id.* at 98:19–25.)

[9] The Court understands the "3-SW pod" to refer to an area of the Jail. Defendant was the "center corridor officer" assigned to the Jail's "3-Corridor," where his responsibilities included "the supervision and control of inmate behavior within the center corridor as well as monitoring activities scheduled for the . . . [MPR]," which is located in the 3-Corridor. (Kitt Aff. ¶ 3.)

[10] Citations to the Logbook Entries refer to the Bates stamp at the bottom right-hand corner of the page. As discussed *infra*, all correction officers at the Jail are strictly required to keep accurate and contemporaneous logbook entries of all inmate activities. Although Defendant's logbook entry appears on page 0097 of Exhibit 5, (*see* Def.'s 56.1 ¶ 35; Logbook Entries 0097), the logbook entry that contains the notation regarding Jackson's refusal to prepare for the Service appears on page 0089, (*see* Logbook Entries 0089). These two pages contain different handwriting and distinct logbook page numbers. (*Compare id.* at 0089 (recorded on page 457 of a logbook), *with id.* at 0097 (recorded on page 29 of a logbook).)

logbook entry, Jackson "was called on by CO Kitt in 3[ ]core to set up for Muslim services[, but] he refused."  (*Id.*)  The logbook entry records this incident at 11:00 A.M.  (*See id.*)

Despite Jackson's refusal to set up for the Service, however, Defendant still called the Service at around 11:00 A.M. "for the second, third[,] and fourth floors" of the Jail facility in which Plaintiff was housed.  (Kitt Aff. ¶ 7; *see also* Def.'s 56.1 ¶ 34 ("Kitt called the Service for the second, third[,] and fourth floors of [the Jail's] housing units, including 3SW—where Plaintiff was housed on October 5, 2014—at or about 11:00 a.m. in compliance with [the Doty Memorandum]."); Cosgriff Decl. Ex. 11 ("Camera Aff.") ¶ 7 (Dkt. No. 183-11) ("The logbooks confirm that on October 5, 2014, Kitt called the Service as scheduled at or about 11:00 a.m. They further reflect that the Service was called/announced to all three floors of 3-SW, consisting of a total of twelve housing units, including . . . where Plaintiff was housed on the date in question.").)[11]

In support of his Motion, Defendant has produced copies of various logbook entries from October 5, 2014.  (*See generally* Logbook Entries.)[12]  Correction officers at the Jail "are strictly required to keep accurate and timely logbooks in accordance with" an official "Policy and Procedure" (the "Logbook Policy") issued by the Westchester County Department of Correction ("WCDOC").  (Def.'s 56.1 ¶ 30; *see* Cosgriff Decl. Ex. 12 ("WCDOC Logbook Policy") (Dkt. No. 183-12); Kitt Aff. ¶ 8 (stating that "[e]very [c]orrection [o]fficer in every section of the [J]ail is required to keep logbook entries," and "[f]ailure to do so is a violation of policy").)  As part of

---

[11] The "Camera Affidavit" was submitted by Keith Camera, who serves as "Assistant Warden of Special Operations at the [Jail]."  (Camera Aff. ¶ 3.)

[12] Defendant has produced these logbook entries with certain redactions pursuant to an order (the "Production Order") by U.S. Magistrate Judge Judith McCarthy ("Magistrate Judge McCarthy").  (Production Order 1 (Dkt. No. 180).)

the Logbook Policy, correction officers are required to keep contemporaneous records, (*see* WCDOC Logbook Policy § IV.D (stating that entries "shall be made without undue delay")), and must "include in their logbook entries all inmate activities, including religious services, with a notation as to the time the activity was called and the number of participating inmates," (Camera Aff. ¶ 9; *see also* WCDOC Logbook Policy § V.B.17 (noting that "logbook entries shall include . . . [a]ll inmate activities, i.e., religious services, recreation, commissary, visits, . . . etc.," and requiring correction officers to "[e]nter time activity commenced/concluded and the number of inmates who participated")).  The records provided by Defendant consist of logbook entries from different correction officers in different areas of the Jail on October 5, 2014.  (*See* Camera Aff. ¶ 6; *see generally* Logbook Entries.)  With the exception of one outlier and one ambiguous entry, the relevant logbook entries uniformly reflect that Defendant called the Service at or around 11:00 A.M.  (*See* Logbook Entries 0076 ("Muslim services announced" at "1100"); *id.* at 0077 ("Muslim service announced" at "1102"); *id.* at 0078 ("Muslim services in 3 core . . . all informed" at "1100"); *id.* at 0081 ("Muslim service announced [in] 3 core" at "1103"); *id.* at 0086 (noting "Muslim svcs" at "1105"); *id.* at 0087 ("Muslim Services announced" at "1100"); *id.* at 0089 ("Muslim services announced to pod [and] all informed" at "1102"); *id.* at 0097 ("Muslim Services in Lg MPR Announced 2nd, 3rd, 4th Floors" at "1100").)[13]

---

[13] One logbook entry contains the notation, "Muslim services announced [illegible]" at "1120."  (*See* Logbook Entries 0084.)  As Assistant Warden Camera correctly notes in his Affidavit, however, that entry "appears to be an outlier."  (Camera Aff. ¶ 7.)  Moreover, even if the Service had been called at 11:20, inmates still would have had sufficient time to participate in the 30-minute Service before noon.  There is another logbook entry that contains the notation, "Off Block – Muslim Services" at "1130."  (*See* Logbook Entries 0080.)  Although this entry is somewhat ambiguous, the Court interprets this notation as likely referring to the scheduled end of the Service.  As noted, the Service was scheduled for 11:00 A.M., (*see* Doty Mem. at unnumbered 1), and took approximately half an hour to complete, (Nashid Aff. ¶ 9).  Finally, Assistant Warden Camera has advised the Court that one logbook entry—from "3 E Housing Control"—could not be located.  (Camera Aff. ¶ 6.)  Although this is a regrettable omission, it

After Defendant called the Service at around 11:00 A.M., several Muslim inmates were transported to the MPR for the Service.  (Kitt Aff. ¶ 10; *see also* Def.'s 56.1 ¶ 34.)  Defendant does not recall Plaintiff being among these inmates.  (Kitt. Aff. ¶ 10.)  As the inmates were arriving for the Service, however, "inmate Jackson began to yell from inside the block that the Service was scheduled for the wrong time and to refuse the prayer."  (*Id.*)  Defendant "do[es] not specifically recall how many inmates arrived for and/or attended the Service," but his logbook contains the notation "0" next to the entry corresponding to the Service, thus "indicating that no inmates attended the Service."  (*Id.*; *see* Logbook Entries 0097.)  Defendant explains that "as far as [he] was concerned, the Service was called as required by [the Doty Memorandum] and all interested inmates identified as Muslim by Imam John Nashid, including Plaintiff, were permitted to attend[, and] thus [he] considered that the Service occurred as scheduled."  (Kitt. Aff. ¶ 10.)  Defendant's logbook entry indicates that at 11:45 A.M., when Plaintiff alleges that the Service was called, Defendant "had been relieved from his post for a lunch break."  (Def.'s 56.1 ¶ 35; Logbook Entries 0097.)

### 3.  Grievance Filings After the Service

Five days after the Service, Plaintiff filed a grievance (the "Grievance") with the New York State Commission of Correction ("NYCOC") regarding the scheduling of the Service. (Def.'s 56.1 ¶ 26; *see* Cosgriff Decl. Ex. 7 ("Pl.'s Grievance") (Dkt. No. 183-7).)  In his Grievance, Plaintiff complains that "[o]n Oct. 5, 2014[,] the Muslim prayer service was not

---

need not preclude summary judgment, particularly in light of the extensive logbook entries that have been provided to the Court, and which almost uniformly corroborate Defendant's version of events despite having been recorded by different correction officers in different units of the Jail.

called at the time it should have been called—9:00 A.M." (Pl.'s Grievance 0110.)[14]  He does not

allege, however, that the Service was called at 11:45 A.M., as he does in the instant Action. (*See*

*id.*)  Rather, he alleges that "[t]he [S]ervice was called at the time of the lunch time feeding!"

(*Id.*)  The "lunch time feeding," by Plaintiff's own admission, takes place at 11:00 A.M. (*See*

TAC ¶ 14 (noting that "1100 was lunch time for the jail").)  One day before Plaintiff filed his

Grievance, his fellow inmate, Jackson, filed his own Grievance with the NYCOC (the "Jackson

Grievance") based on the same events. (*See* Def.'s 56.1 ¶ 26 n.10; Cosgriff Decl. Ex. 8

("Jackson Grievance") (Dkt. No. 183-8).)  In his grievance, Jackson alleged that the Service was

called at "exactly 11:02 A.M." (Jackson Grievance 0133.)[15]

### B. Procedural History

Plaintiff filed his initial Complaint on October 2, 2015, naming Warden Doty, Father

Paul, Imam Nashid, Warden Orlando, "Commissioner Kevin Cheverko," and Kitt as Defendants.

(*See* Dkt. No. 2.)  These Defendants filed an initial motion to dismiss on September 19, 2016,

(Dkt. Nos. 21–24), and Plaintiff responded on December 12, 2016, (Dkt. No. 27).  On May 22,

2017, the Court issued an Opinion & Order (the "May 2017 Opinion") granting that motion and

dismissing the Complaint without prejudice. (May 2017 Opinion 12 (Dkt. No. 31).)  Plaintiff

filed a First Amended Complaint on June 27, 2017, (Dkt. No. 34), and a Second Amended

Complaint on May 8, 2018, (Dkt. No. 86).

On September 25, 2018, Plaintiff filed the instant Third Amended Complaint, naming

Warden Doty, Father Paul, Imam Nashid, Warden Orlando, and Kitt as Defendants. (*See* TAC.)

---

[14] Citations to the Grievance refer to the Bates stamp at the bottom right-hand corner of the page.

[15] Citations to the Jackson Grievance refer to the Bates stamp at the bottom right-hand corner of the page.

Defendants filed a motion to dismiss on November 13, 2018, (Dkt. No. 115), Plaintiff filed a memorandum in opposition on December 14, 2018, (Dkt. No. 120), and Defendants replied on January 11, 2019, (Dkt. No. 121).  On May 16, 2019, the Court issued an Opinion & Order (the "May 2019 Opinion") granting in part and denying in part Defendants' motion.  (May 2019 Opinion 16 (Dkt. No. 125).)  The Court dismissed Father Paul, Imam Nashid, and Warden Orlando from the case with prejudice, but dismissed Warden Doty from the case without prejudice.  (*Id.*)  The May 2019 Opinion provided that if Plaintiff wished to file a fourth amended complaint as to Defendants Kitt and Doty only, he had 30 days to do so, and stated that if he failed to abide by this 30-day deadline, his claims could be dismissed with prejudice.  (*Id.*)  Plaintiff chose not to file a fourth amended complaint, deciding instead to move forward with what remained of his Third Amended Complaint, namely the instant claim against Defendant. (*See* Dkt. No. 129.)

On August 15, 2019, Defendant filed his Answer to the Third Amended Complaint. (Dkt. No. 140.)  The Court held a status conference on October 10, 2019, (*see* Dkt. (minute entry for Oct. 10, 2019)), and referred the case to Magistrate Judge McCarthy for supervision of discovery and general pre-trial matters on December 12, 2019, (Dkt. No. 153).  On June 4, 2020, Defendant filed the instant Motion for Summary Judgment and supporting papers.  (Dkt. Nos. 182–86.)  On July 8, 2020, Plaintiff submitted a short (1.5 pages), handwritten letter opposing the Motion.  (*See* Letter from Pl. to Court ("Pl.'s Letter") (Dkt. No. 189).)  Defendant filed his Reply on July 24, 2020.  (Dkt. No. 191.)

II.  Discussion

A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation, alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (citation and quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr*., 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)).  Where the evidence presents "a question of 'he said, she said,'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court").  And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [the plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344; *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest,"

*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and citation

omitted).  Moreover, "the failure to oppose a motion for summary judgment alone does not

justify the granting of summary judgment."  *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also*

*Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the

legal validity of an entry of summary judgment should . . . be[] made in light of the opposing

party's pro se status" (italics omitted)).  "Nonetheless, proceeding pro se does not otherwise

relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald

assertions unsupported by evidence[] are insufficient to overcome a motion for summary

judgment."  *Houston*, 27 F. Supp. 3d at 351 (alterations, italics, citation, and quotation marks

omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2

(S.D.N.Y. July 31, 2017) (same).

    B.  Analysis

        Defendant urges the Court to grant summary judgment and dismiss the TAC because

record evidence establishes that Plaintiff's religious beliefs were not substantially burdened.

(*See* Def.'s Mem. of Law in Supp. of Mot. ("Def.'s Mem.") 8–14 (Dkt. No. 186).)  In the

alternative, Defendant argues that he is shielded by qualified immunity.  (*Id.* at 16–18.)

        It is well-established that the First Amendment affords inmates constitutional protection

to practice their religion.  *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (holding

that "[i]nmates clearly retain protections afforded by the First Amendment, including its

directive that no law shall prohibit the free exercise of religion" (citation omitted)); *Ford v.*

*McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (explaining that "[p]risoners have long been

understood to retain some measure of the constitutional protection afforded by the First

Amendment's Free Exercise Clause").  However, because of inmates' unique circumstances,

their free exercise rights are necessarily more constrained than those of other persons.  *See*

*Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990) ("Balanced against the constitutional

protections afforded prison inmates, including the right to free exercise of religion, are the

interests of prison officials charged with complex duties arising from administration of the penal

system." (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974))).

     A prisoner's free exercise claims are therefore "judged under a 'reasonableness' test less

restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights."

*Ford*, 352 F.3d at 588 (quoting *Farid v. Smith*, 850 F.2d 917, 925 (2d Cir. 1988)).  To state a free

exercise claim, an inmate "must make a threshold showing that 'the disputed conduct

substantially burdened his sincerely held religious beliefs.'"  *Washington v. Chaboty*, No. 09-

CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (alteration omitted) (quoting

*Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) (summary order)); *see also*

*Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) (same).  To show a "substantial

burden," the inmate must show that "the state [has] put[] substantial pressure on an adherent to

modify his behavior and to violate his beliefs."  *Rossi v. Fishcer*, No. 13-CV-3167, 2015 WL

769551, at *7 (S.D.N.Y. Feb. 24, 2015) (citation omitted).  That is, "[t]he relevant question in

determining whether [the inmate's] religious beliefs were substantially burdened is whether

participation in the [religious activity], in particular, is considered central or important to [the

inmate's religious] practice."  *Ford*, 352 F.3d at 593–94.  "Once [an inmate] establishes this

burden, '[t]he defendant[] then bear[s] the relatively limited burden of identifying the legitimate

penological interests that justify the impinging conduct.'"  *Smith v. Perlman*, No. 11-CV-20,

2012 WL 929848, at *7 (N.D.N.Y. Mar. 19, 2012) (second alteration in original) (quoting

*Salahuddin*, 467 F.3d at 308).  The burden remains with the inmate "to show that these

articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (citation, alteration, and quotation marks omitted).

Following discovery, the undisputed evidence in this case shows that Defendant called the Service at or near 11:00 A.M.—not at 11:45 A.M., as Plaintiff claims.  As noted, if "the burden of proof at trial would fall on the nonmoving party," as it would here, "it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs.*, 735 F.3d at 123 (citations omitted).  Here, Defendant has not merely pointed to a lack of evidence to support Plaintiff's free exercise claim, but has produced substantial documentary evidence that comprehensively undermines that claim.  The logbook entries, which were contemporaneously recorded by different correction officers at different parts of the facility, almost uniformly indicate that Defendant called the Service at or around 11:00 A.M.  (*See* Logbook Entries 0076, 0077, 0078, 0081, 0086, 0087, 0089, 0097.) These records are fatal to Plaintiff's factual allegation.  *Cf. Headley v. Fisher*, No. 06-CV-6331, 2010 WL 2595091, at *4 (S.D.N.Y. June 28, 2010) (holding that "[c]ontemporaneous [l]ogbook entries eliminate[d] any genuine issue of material fact that [the plaintiff] was not deprived of opportunities to shower and go to recreation while under keep-lock status"); *Gaston v. Coughlin*, No. 98-CV-6016, 2005 WL 1177869, at *13 (W.D.N.Y. May 18, 2005) (holding that the plaintiff's "bald, conclusory statements" that were contradicted by evidence in a prison's "[a]ctivity [l]og" were "insufficient to defeat summary judgment").  The logbook entries are also consistent with Plaintiff's own Grievance, filed just a few days after the events in question, in which he stated that the Service "was called at the time of the lunch time feeding[,]" (Pl.'s

Grievance 0110), that is, at 11:00 A.M., (TAC ¶ 14).  Plaintiff's claim is further undermined by the Jackson Grievance, which, as noted, states that the Service was called at "exactly 11:02 A.M." (Jackson Grievance 0133.)

In response, Plaintiff has failed to "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *CILP Assocs.*, 735 F.3d at 123 (citation omitted).  Indeed, Plaintiff has come forward with nothing.  His case rests on a supposed logbook entry which he claims was once in his possession but has since been "lost." (*See* Pl.'s Dep. 80:21–24, 81:15–16.)  As is true in response to any motion for summary judgment, however, Plaintiff is required to provide evidence sufficient to allow a jury to find in his favor, as "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  In his 1.5-page letter in opposition to summary judgment, Plaintiff resorts to the assertion that Defendant must have "fixed" the logbook entries. (Pl.'s Letter 1.)  His only support for this assertion is the fact that no inmates attended the Service. (*See id.*)  That is, Plaintiff argues that if Defendant truly did call the Service at 11:00 A.M. and did not doctor the entries, then he (Defendant) cannot explain why "no one show[ed] up to the [S]ervice." (*Id.*)  In fact, undisputed evidence from the record suggests a fairly obvious explanation as to why no inmates attended the Service: As soon as they began to arrive, Jackson, the inmate "Muslim Coordinator," "began to yell from inside the block that the Service was scheduled for the wrong time and [instructed inmates] to refuse the prayer." (Kitt Aff. ¶ 10.)  In his opposition letter, Plaintiff does not dispute—or even address—this point. (*See* Pl.'s Letter 1.)  In any event, Plaintiff may not defeat summary judgment by alleging in conclusory fashion that Defendant must have tampered with the logbook entries. *See Goonewardena v. Spinelli*, No. 15-CV-5239, 2020 WL 1557745, at *11 (E.D.N.Y. Mar. 5, 2020) (granting summary judgment for

the defendants where the plaintiff "ha[d] not adduced any evidence [to support his theory] that the certified court documents and transcripts [relied upon by the defendants] may have been fabricated, [and] ha[d] [not] . . . uncovered any reason to believe that the documents [were] inaccurate"), *report and recommendation adopted in relevant part*, 2020 WL 1550724 (E.D.N.Y. Mar. 31, 2020); *Quick v. Quinn*, No. 12-CV-1529, 2014 WL 4627106, at *4 (N.D.N.Y. Sept. 11, 2014) ("Turning now to [the] plaintiff's contention that the timecard submitted by [the] defendant [correction officer] is not authenticated and may have been altered, I find it unsupported by any record evidence and therefore not a basis upon which I may conclude a genuine dispute of material fact exists for trial."); *Hilton v. Maltese*, No. 09-CV-1373, 2012 WL 6965105, at *6 n.10 (N.D.N.Y. Dec. 14, 2012) ("Plaintiff's conclusory assertion that the transcript and other records of his disciplinary hearing were completely fabricated is not sufficient to establish a material issue of fact . . . ."), *report and recommendation adopted*, 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013).

Thus, there is no genuine dispute of material fact regarding when the Service was called. The factual basis for Plaintiff's free exercise claim—namely, that Defendant called the Service at 11:45 A.M. and then unilaterally canceled it moments later, (*see* TAC ¶ 18)—has been undermined by undisputed evidence in the record.  It may be true that Plaintiff was unable to attend the Service as he had hoped.  But even assuming this constitutes a substantial burden on his religious practice, Plaintiff has failed to establish either that Defendant was responsible for this burden, or that there is a dispute of material fact that precludes summary judgment on his claim.  Indeed, there are other explanations for why Plaintiff could (or did) not participate in the Service.  It is possible, for example, that the officer who heard Defendant's call-out did not come to retrieve Plaintiff at the proper time as he should have, for as Plaintiff explained at his

deposition, Defendant "doesn't announce the service over the [loud]speaker," but rather, "[h]e calls the officer in the block and informs him." (Pl.'s Dep. 106:20–24.) It might also be that Plaintiff chose to follow the lead of Jackson, the inmate "Muslim Coordinator" who, at the very moment the Service was being called, loudly encouraged fellow Muslims to refuse to participate in the Service. (*See* Kitt Aff. ¶ 10.) To resolve the instant Motion, the Court need not think of every plausible scenario that might explain why Plaintiff did not attend the Service. Plaintiff has only offered one theory to support his claim. It suffices to conclude that this theory—in which Defendant called the service at 11:45 A.M. and canceled it moments later—is clearly wrong. Because Plaintiff has failed to show that Defendant substantially burdened his religious beliefs, the Court will grant Defendant's Motion and dismiss Plaintiff's free exercise claim.[16] The Court need not reach Defendant's qualified immunity argument.

### III.  Conclusion

For the foregoing reasons, Defendant's Motion is GRANTED.

The Clerk of the Court is respectfully requested to terminate the pending Motion, (Dkt. No. 182), enter judgment for Defendant, close the case, and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

DATED:     March 23, 2021
                White Plains, New York

                                             KENNETH M. KARAS
                                             UNITED STATES DISTRICT JUDGE

---

[16] Insofar as Plaintiff's free exercise claim is based on his contention that the Service should have been scheduled before 11:00 A.M., Plaintiff relied on this theory only with respect to Imam Nashid, Father Paul, and Wardens Orlando and Doty, (*see* TAC ¶¶ 22–23), as Defendant had no role in scheduling the Service, (*see* Def.'s 56.1 ¶ 27; Kitt Aff. ¶ 6). In any event, the Court has already rejected Plaintiff's "scheduling" theory of liability in a prior Opinion & Order. (*See* May 2019 Opinion 13–16.)